UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD WILLIAM HUGHES, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN COLVIN, Acting Commissioner, ) <br> Social Security Administration, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 12-11576-DJC |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                                                March 28, 2014

### I.    Introduction

Plaintiff Richard William Hughes ("Hughes") filed claims for disability insurance benefits ("SSDI") with the Social Security Administration ("SSA"). Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Hughes brought this action for judicial review of the final decision of Defendant Carolyn Colvin, Acting Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on March 26, 2012, denying her claim. Before the Court are Hughes' motion for judgment on the pleadings, D. 11, requesting reversal of the decision below, and the Commissioner's motion to affirm that decision, D. 17. In his motion, Hughes claims that the ALJ erred in denying his claim by: (1) determining Hughes' residual functioning capacity ("RFC") without considering the substantial evidence in the record of his physical and mental impairments, D. 12 at 5-9, and (2) failing to grant his treating physician's opinions controlling weight when determining Hughes' RFC. Id. at 10-11. For the reasons explained below, the

1

Court GRANTS the Commissioner's motion to affirm and DENIES Hughes's motion for judgment on the pleadings.

## II. Factual Background

In his March 13, 2011 application for SSDI, Hughes alleged disability since January 1, 2000 due to prostate cancer, bone cancer, left shoulder pain, a lack of cartilage in his right shoulder, spinal stenosis and rheumatoid arthritis. R. 64.[1] Hughes was 62 years old at the time of the ALJ hearing. R. 37. Hughes had previously worked as a carpenter, firefighter and air duct cleaner. R. 40, 44. Hughes' date last insured was June 30, 2004. R. 35, 168.

## III. Procedural Background

Hughes filed a claim for SSDI on March 14, 2011. R. 171. His claim was denied after initial review on April 8, 2011, R. 90-92, and denied again, upon reconsideration, on August 11, 2011. R. 93-95. On September 22, 2011, Hughes filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R. 97. A hearing was held before an ALJ on March 12, 2012. R. 29. In a written decision dated March 26, 2012, the ALJ determined that Hughes was not disabled within the definition of the Social Security Act and denied his claims. R. 11-23. Hughes appealed the ALJ's decision to the Appeals Council on May 25, 2012. R. 279-86. On June 25, 2012, the SSA's Appeals Council denied Hughes' request for review, thereby rendering the ALJ's decision as the final decision of the Commissioner. R. 1-4.

---

[1] "R." refers to the administrative record that is filed at D. 10.

**IV.     Discussion**

   **A.     <u>Legal Standards</u>**

   *1.     Entitlement to Disability Benefits and Supplemental Security Income*

A claimant's entitlement to SSDI turns in part on whether he has a "disability," defined in the Social Security context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i), 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The inability must be severe, rendering the claimant unable to do his previous work or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The Commissioner must follow a five-step process when she determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted. 20 C.F.R. § 416.920. All five steps are not applied to every applicant; the determination may be concluded at any step along the process. <u>Id.</u> First, if the applicant is engaged in substantial gainful work activity, then the application is denied. <u>Id.</u> Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied. <u>Id.</u> Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted. <u>Id.</u> Fourth, if the applicant's RFC is such that he can still perform past relevant work, then the application is denied. <u>Id.</u> Fifth and finally, if the applicant, given his RFC, education, work experience, and age, is unable to do any alternate work, the application is granted. <u>Id.</u>

*2. Standard of Review*

This Court has the power to affirm, modify or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). Such review, however, is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted). Thus, if the ALJ made a legal or factual error, Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citation omitted), the Court may reverse or remand such decision to consider new material evidence or to apply the correct legal standard. See 42 U.S.C. § 405(g).

**B.     Before the ALJ**

*1.     Medical History*

Hughes submitted medical records from various medical providers regarding his physical impairments due to prostate cancer, a heart condition, left shoulder tear and lumbar degenerative disc disease, as well as mental impairment due to post-traumatic stress disorder ("PTSD"). While some records date back to 1990, the record presents piecemeal medical evidence between the years 1990 and 2005 and then more continuous evidence from the period from 2005 to 2012.

*a) Physical Conditions*

Hughes was first diagnosed with prostate cancer in 2000 at Winchester Hospital. R. 292-93. Hughes' primary care physician, Dr. Edward Wong, noted that Hughes was unhappy with the cancer treatment he received at Massachusetts General Hospital ("MGH") and that Hughes wanted to stop treatment and monitor his prostate-specific antigen ("PSA") counts on his own. R. 390. Dr. Wong agreed to order monthly PSA tests so that Hughes could self-monitor, but also advised him to continue to seek oncology treatment. Id. The next medical record of prostate cancer treatment is dated February 2007, seven years later, when Hughes returned to MGH. R. 570 (March 7, 2011 discussing oncologic history). MGH's March 2011 oncology records indicate that Hughes' prostate cancer metastasized further in 2008. Id. In March 2011, an MGH oncologist indicated that Hughes suffered from back pain and that his cancer was "clearly progressive with extensive skeletal disease." R. 573. Hughes appears to have continued oncology treatments at MGH from early 2008 through 2011. R. 575.

In 2000, physicians recommended that Hughes treat his chronic hypertension with medication. R. 826-27. Hughes underwent an electrocardiogram screening in early 2002 after experiencing heart palpitations. R. 537. This test revealed Hughes had a left-side accessory pathway. Id. The physician noted after testing that Hughes had "no risk of atrial arrhythmia" and that the physician "was not convinced" that Hughes had experienced any heart murmur, based on the test results. Id. In April 2004, Hughes again went to see Dr. Wong after experiencing heart palpitations, but did not report chest pain or pressure. R. 785. Dr. Wong observed that Hughes was "fully ambulatory with ease" and that the treatment plan was to monitor Hughes. Id. Notes from January 2005 also reflect the assessment of hypertension. R. 780. In October 2008, Hughes underwent a successful catheter ablation surgery. R. 666-67.

In March 2000, Hughes had left rotator cuff surgery to repair a tear. R. 822-23. After a January 2002 physical examination, Dr. Wong recorded that Hughes was "physically extremely very active and in superb shape." R. 796. Dr. Wong noted in January 2004 that Hughes "runs 20 miles per week" and does triathlons, R. 787, in July 2004 that Hughes "reports working out regularly at the gym," R. 783, and in January 2005 that Hughes had a "superb" level of physical fitness. R. 781. This level of fitness and physical ability was confirmed by Hughes' orthopedic surgeon in June 2004, who recorded that Hughes was an "avid weight lifter as well as a carpenter" and noted both were high-risk activities for a patient with a history of rotator cuff pain. R. 526.

*b) Post-Traumatic Stress Disorder*

Clinical psychologist Dr. John Greene, Ph.D., began treating Hughes in July 1990. R. 1226-27. Hughes reportedly was highly anxious and at work was unable to perform routine duties at which he previously had been proficient, such as connecting hoses to fire hydrants and driving the truck to city locations. Id. Dr. Greene concluded that Hughes was suffering from PTSD as a result of his experiences at work. R. 1227. Dr. Greene recorded that Hughes became increasingly agitated when talking about the fire department and noted particular anxiety regarding a July 1988 fire at Ivy Road in Malden. R. 1227. When asked about responding to emergency medical calls, Hughes responded with statements such as "we were always too late." Id. In a letter dated August 2000, Dr. Greene stated that he had treated Hughes since 1990 and that he still could not work as a firefighter because he continued to suffer from PTSD. R. 1264-65. Considering Dr. Greene's recommendation, the Malden Retirement Board's medical panel determined Hughes could not return to his duties as a firefighter in 1992 and approved his accidental disability application. R. 1221-23.

6

Dr. Greene's next letter, dated January 3, 2012,[2] stated that Hughes was "totally, socially and vocationally disabled." R. 1266-67. Dr. Greene stated in this letter that Hughes has been his patient for ten years and he wrote that the PTSD resulted from an incident in the United States Navy around 1969-70 and also referenced the trauma that resulted from the 1988 fire. R. 1266. Dr. Greene assigned Hughes a Global Functioning Assessment ("GAF") score of 30.[3] Dr. Greene reported that Hughes's GAF score of 30 meant that Hughes had significant problems with concentration, attention and memory problems and was in constant pain that interfered with mentation. R. 1267. Dr. Greene also wrote that Hughes "deserves the maximum disability." Id.

   2.   *RFC Assessments and Other Evaluations by Massachusetts Disability Determination Services*

Two state agency physicians evaluated Hughes' disability application and medical evidence in April 2011 and August 2011, respectively. R. 64-69, 71-81. Both physicians concluded that Hughes was not disabled. R. 69, 80. The second evaluation included a RFC assessment for the period spanning from November 2005 to 2007. R. 78-80. The second evaluation in August 2011 indicated that Hughes had limited overhead reaching abilities due to

---

[2] There is, however, a gap in medical evidence demonstrating Dr. Greene treated Hughes between 2000 and 2012, which Hughes explained primarily was due to a fire at Dr. Greene's office that destroyed the records. R. 19. The ALJ noted that "[r]egardless, based on the totality of the circumstances, the undersigned does not feel these records are necessary to reach a decision in this matter." Id.

[3] The GAF scale is used to report a clinician's judgment of an individual's overall level of psychological, social, and occupational functioning and refers to the level of functioning at the time of evaluation. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32–33 (4th ed., text rev. 2000) ("DSM–IV"). GAF scores can range from 0 to 100. Id. A GAF score between 21–30 is described as follows: "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)." Bowden v. Astrue, No. 11-84 DLM, 2012 WL 1999469 at *9 n.13 (D.R.I. June 4, 2012) (quoting DSM–IV at 34).

his rotator cuff injuries, as well as postural limitations that would limit him to occasional crawling and ladder climbing. R. 79-80.

### 3. ALJ Hearing

At the March 12, 2012 administrative hearing, the ALJ heard testimony from two witnesses, Hughes and vocational expert ("VE") Mr. Larry Takke. R. 49-58, 58-62. The ALJ directed Hughes' attention to the time period prior to June 30, 2004. R. 35-36. Hughes testified that he had worked intermittently and informally for his son's carpentry business. R. 38-40. His son did not pay him regularly, but would take him out to dinner or reimburse him for picking up construction materials. R. 38-39. Hughes stated he would help out as needed, "just to get out of the house." R. 39. Hughes also testified that he tried to start his own air duct cleaning business for three to four years, approximately between 2005 and 2008. R. 41-42. Prior to 2000, Hughes worked as a firefighter until 1991, then intermittently as a carpenter. R. 44-45. Hughes stated that he had not worked for a period of time after his cancer diagnosis in 2000, and he could not recall the last time he had worked. R. 43-44.

When asked by the ALJ if he thought he was capable of working between 2000 and 2004, Hughes responded "mentally, I wasn't, no. I couldn't do it. Mentally – maybe, physically if someone said, you know, you have to do this . . . go out and work and make me work, I would suppose I could probably have to do it." R. 46. Hughes explained his mental state at that time was one of constant anxiety due to worrying about his cancer diagnosis, his family and their future. R. 47. Hughes testified seeing Dr. Greene to "deal with different things." R. 47. Hughes also cited his difficulty working with people as a mental barrier to working during this time, testifying that this was the main reason he stopped working with his son. R. 50. As for physical impairments, Hughes testified that back and shoulder pain made it difficult for him to

reach up and stand on ladders, but acknowledged that he could lift fifty to sixty pounds during that time period and did not recall having problems standing or sitting. R. 52.

The VE testified that Hughes' work as a carpenter is categorized generally as a skilled job, with a medium duty exertion level and a specific vocational preparation level ("SVP") of 7, although Hughes performed it at a heavy duty level. R. 59. He testified that a firefighter's work is skilled work with a heavy duty exertion level and a SVP of 6, while an air duct cleaner is unskilled work with a medium duty exertion level and a SVP of 2. Id. The ALJ then presented the VE with a hypothetical RFC of a person who could perform medium duty work, with the occasional ability to reach overhead, crawl or climb, and asked if that person would be able to perform Hughes' past work. R. 59-60. The VE responded that none of Hughes' prior work could be performed with that RFC because they all required either constant reaching overhead or a heavy exertion level. R. 60. The VE further testified that there would be alternate work available for a person with that RFC, such as a car cleaner, hospital cleaner or hand packager, which were jobs available in Massachusetts and the national economy. Id. The ALJ then modified the hypothetical, asking the VE whether there would be jobs available to a hypothetical person, who had the initial RFC, as well as "moderately severe limitations which seriously affects an individual's ability to function and results in unsatisfactory performance." R. 60-61. The VE replied that there would not be full-time work for such a person. R. 61.

    *4.     Findings of the ALJ*

Following the five-step process outlined in 20 C.F.R. § 416.920, at step one, the ALJ found that Hughes had not engaged in substantial gainful activity during the period January 1, 2000 through his date last insured of June 30, 2004. R. 13-14. Hughes does not dispute this finding. D. 12 at 4.

At step two, the ALJ found that Hughes suffered from multiple severe impairments: prostate cancer, left rotator cuff tear, lumbar degenerative disc disease, superventricular tachycardia with left later[al] accessory pathway and PTSD. R. 14. Hughes does not dispute this finding. D. 12 at 4.

At step three, the ALJ found that Hughes did not have an impairment, singly or in combination, that was medically equivalent to one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 14; 20 C.F.R. §§ 404.1520(d)-(e), 404.1525 - 404.1526. R. 14. Hughes appears to dispute the step three finding, although in doing so discusses the ALJ's RFC analysis. D. 12 at 5.

Before proceeding to step four, the ALJ determined that Hughes had the RFC "to perform medium work," with the limitations that he can only occasionally crawl, engage in overhead reaching with his left hand or climb ladders, ropes and scaffolds. R. 16. Hughes disputes this finding, arguing that the ALJ overlooked substantial evidence of his physical and mental impairments that further limited his RFC. At step four, the ALJ concluded that through June 30, 2004, Hughes was unable to perform any of his past relevant work because those positions required constant overhead reaching or heavier exertion than Hughes' ability to perform medium work. R. 21. Hughes does not dispute this finding. D. 12 at 4-5.

At step five, the ALJ concluded that Hughes could have performed alternate jobs that existed in significant numbers within the national economy, such as cleaner and hand packager; therefore, Hughes was not disabled from January 1, 2000 through June 30, 2004. R. 22-23. Hughes disputes this finding. D. 12 at 5.

    *5. Hughes's Challenges to the ALJ's Decision*

Hughes argues that the ALJ erred in two ways. Hughes first contends that the ALJ's determination that Hughes has the RFC to perform "medium work" failed to fully incorporate the majority of medical evidence demonstrating his physical and mental limitations. D. 12 at 4. Second, Hughes argues that the ALJ did not grant controlling weight to his treating physician, and in doing so, improperly substituted the ALJ's own medical judgment. Id. at 10. For the reasons discussed below, this Court finds no reversible error and affirms the ALJ's decision.

    a)  <u>The ALJ Fully Evaluated the Medical Evidence</u>

Hughes argues that substantial medical evidence of physical limitations render him unable to perform the RFC imposed by the ALJ. Id. at 5. Hughes points to the fact that he "has remained in ongoing treatment with several providers" as evidence of continuous limitations on his work ability due to medical conditions. Id. This Court concludes that the ALJ did not err in determining Hughes' RFC, as she fully evaluated all of the evidence presented and thoroughly explained the medical evidence she relied upon.

While Hughes lists a multitude of medical conditions that he has suffered from since 2000, the Court concludes that the ALJ was required to focus only on the severity of the impairments during the period January 1, 2000 through June 30, 2004, the date last insured.[4] It is a long-standing principle that a "[c]laimant is not entitled to disability benefits unless he can demonstrate that his disability existed prior to the expiration of his insured status," here 2004. Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986). Despite the physical or mental condition of the claimant on the date of the hearing, the ALJ was tasked with

---

[4] The "date last insured" is the last day on which the claimant was insured for disability insurance by the SSA and eligible for benefits. 20 C.F.R. § 404.101. This date is determined by the SSA and is a function of the claimant's age and earnings history, based on the total quarters worked throughout the claimant's life. See 20 C.F.R. §§ 404.130, 404.132. The date assigned always will be the end of the calendar quarter in which the claimant was last insured. 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:20 (2nd ed. 2013).

determining disability during the period beginning with the alleged onset date of disability and ending with the date last insured. 42 U.S.C. §§ 416(i), 423(c). "It is not sufficient for a claimant to establish that [his] impairment had its roots before the date that [his] insured status expired. Rather, the claimant must show that [his] impairment(s) reached a disabling level of severity by that date." Garcia v. Sec'y of Health & Human Servs., No. 93-2349, 1994 WL 235328, at *3 (1st Cir. June 1, 1994). It follows that the ALJ may not use medical evidence of disability onset after the date last insured to support a finding of disability during the period prior to the date last insured. See Eichstadt v. Astrue, 534 F.3d 663, 665 (7th Cir. 2008) (denying disability benefits because "the record did not support a finding that the onset of Eichstadt's disability occurred *before* her 'date last insured'") (emphasis in original); Biron v. Astrue, No. 09-40084-FDS, 2010 WL 3221950, at *7 (D. Mass. Aug. 13, 2010) (upholding ALJ benefits denial due to lack of medical evidence of disability prior to date last insured). The ALJ correctly identified the date range of January 1, 2000 and June 30, 2004 as the bounds of her review when evaluating the severity of Hughes' impairments. R. 11-12.

The ALJ reviewed all evidence in the record, noting in her opinion that there is evidence of later injury or incapacity, but insufficient evidence that those limitations were present and severe enough to prevent all work during the relevant period. R. 15. Hughes primarily argues that the ALJ's conclusion was against the weight of the evidence, because the ALJ failed to take into account the period during which Hughes was self-medicating and self-monitoring his cancer, i.e., between 2000 and 2007. D. 12 at 6-7. The ALJ recognized that Hughes' prostate cancer had metastasized, she noted that the first documentation of climbing PSAs was in 2007 and that this evidence could therefore not support a disability finding prior to June 30, 2004. R. 15. The record shows that Hughes had cancer treatment in 2000 and then opted for self-

medication and holistic treatment. R. 390. Then, there is a gap in evidence of prostate cancer until 2007, when he returned to MGH to pursue active treatment. R. 570-71. As the ALJ stated in her opinion, there is "little evidence of treatment or symptoms until 2006 or 2007, which is years after the date last insured." R. 18. "Giving the claimant the benefit of the doubt," the ALJ found any symptoms undocumented before 2004 may have "caused some limitations, but not more restrictive than the medium exertion level." Id. Regarding the allegation of cancer or degenerative disc disease after 2004, the ALJ "did not 'fail to consider' this evidence, but instead she examined it as required and subsequently concluded that the evidence was irrelevant, because it did not address the correct time period." Eichstadt, 534 F.3d at 667.

The ALJ's RFC was also based on Dr. Wong's exam notes and Hughes' hearing testimony. Throughout the relevant disability period in question, Dr. Wong consistently recorded that Hughes was in excellent physical shape, lifting weights, completing triathlons and intermittently working in carpentry. R. 18, 781, 783, 796. Dr. Wong categorized Hughes as in excellent physical health after routine examinations in both 2000 and 2004. R. 787, 796. Hughes' testimony further supports that his physical abilities had not been comprised before 2004, as he admitted lifting fifty to sixty pounds during this period, R. 52, and stated he could have physically worked if he had too. R. 50. Hughes testified to back and shoulder pain during this time period, but that this did not preclude Hughes from working entirely. R. 51, 55-56. Instead, Hughes testified that his anxiety over his cancer was his main obstacle to working between 2000 and 2004, R. 46-47, and stated he was highly anxious about not being able to financially support his family if his cancer progressed. Id.

Third, the ALJ considered evidence from two state agency physician consultants, who concluded that Hughes was not disabled for the period ending June 30, 2004 due to "insufficient

13

evidence" of disability prior to this date.  R. 19, 68, 80.  These agency opinions support the ALJ's conclusion regarding Hughes' ability to work.  The ALJ afforded "some weight" to the 2005 reconsideration determination and incorporated it into her final RFC by limiting Hughes' overhead reaching.  R. 19.  Hughes points out that the 2005 determination indicated a RFC of "light work," yet, the ALJ had discretion to reduce the weight she gave to that evidence when she found it inconsistent with the record as a whole.  R. 19; see Rodriguez-Gonzalez v. Astrue, 854 F. Supp. 2d 176, 184-85 (D.P.R. 2012) (noting that "[t]he weighing of such inconsistencies is a function delegated to the administrative law judge, not to the court on judicial review").

Because the ALJ documented that she considered all medical evidence in the record and based Hughes' RFC on evidence of his limitations during the relevant time period between 2000 and 2004, this Court finds that the ALJ did not err factually or legally in determining Hughes' physical limitations or determining his RFC.

          b)        <u>The ALJ Considered the Treating Source's Opinions and Provided Good Reasons for Reducing the Weight of this Evidence</u>

Hughes also argues that the ALJ improperly overlooked three decades of evidence of PTSD and erred by not assigning controlling weight to his treating physician's opinions regarding Hughes' mental impairment and RFC.  D. 12 at 7-10.  This Court finds no error because the ALJ had discretion to give less weight to Dr. Greene's medical opinions from 1992, 2000 and 2012 based on the lack of evidence between 2000 and 2012 and their inconsistencies with the overall record.  R. 20-21.

An ALJ should give controlling weight to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); see Abubakar v. Astrue, No. 11-cv-10456-DJC, 2012 WL 957623, at *10 (D.

Mass. Mar. 21, 2012) (stating that ALJ has discretion to assign weight to treating physician's opinion based on its consistency with overall record). However, "the law in this circuit does not require ALJs to give greater weight to the opinions of treating physicians," as she is granted discretion to resolve any evidentiary conflicts or inconsistencies. Arroyo v. Sec'y of Health & Human Servs., 932 F.2d 82, 89 (1st Cir.1991); see also Costa v. Astrue, 565 F. Supp. 2d 265, 271 (D. Mass. 2008) (noting that "an ALJ is not required to give a treating physician's opinion controlling weight"); Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (same).

If the ALJ determines that the treating physician's opinion is not entitled to controlling weight, the ALJ must determine the amount of weight the opinion is entitled to based on the following six factors: (1) "[l]ength of treatment relationship and the frequency of examination," (2) "[n]ature and extent of the treatment relationship," (3) "[s]upportability" of the medical opinion, (4) consistency of the opinion "with the record as a whole," (5) "[s]pecialization" of the treating source, and (6) "other factors . . . that tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c). The ALJ's reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Alberts v. Astrue, No. 11-11139-DJC, 2013 WL 1331110, at *8 (D. Mass. Mar. 29, 2013) (citation omitted). The ALJ is not required to discuss all six factors under 20 C.F.R. § 404.1527(c) in her decision, so long as she gives rational reasons, supported by evidence, for the weight she ultimately assigns to the treating physician's opinion. Alberts, 2013 WL 1331110, at *8-9; see also Delafontaine v. Astrue, No. 10-cv-027-JL, 2011 WL 53084, at *14 (D.N.H. Jan. 7, 2011). These factors provide a balancing test. See Conte v. McMahon, 472 F. Supp. 2d 39, 48 (D. Mass. 2007) (calling factors "the quintessential balancing test" and stating ALJ has ability to stress certain factors as long as supported by substantial evidence).

Therefore, it was entirely within the ALJ's power to conclude that Dr. Greene's opinion should not be afforded controlling weight, as long as she adequately explained the reasons for her decision. See id.; see also 20 C.F.R § 404.1527(c)(2).

The ALJ acted within her discretion in assigning "some weight" to Dr. Greene's medical opinions. The ALJ gave some weight to Dr. Greene's 1992 and 2000 opinions, providing reasons for this discretionary choice that reflect the six statutory factors. R. 20-21. First, the ALJ addressed the length, nature and extent of treatment by noting that Dr. Greene submitted medical notes evidencing Hughes' psychological treatment started in 1990. R. 20. Yet, despite the "supposed long-standing treatment history," the ALJ noted that Dr. Greene's 2012 determination could not be considered retrospectively to Hughes's condition between 2000 and 2004. R. 21. The ALJ accepted, not ignored, that Dr. Greene diagnosed Hughes with PTSD in 1990 and that Hughes was disabled from being a firefighter in 1992. R. 20. In fact, the RFC that the ALJ adopted reflected Dr. Greene's PTSD notes from 1992, which limited Hughes from working in "hazardous or life threatening conditions" or where he would routinely see injured people. R. 16, 20. As the 1992 and 2002 opinions both narrowly focused on Hughes' ability to work as a firefighter, not work in any capacity, it was reasonable for the ALJ to assign only "some weight" to these opinions in her analysis. R. 20.

The ALJ assigned "little weight" to Dr. Greene's 2012 opinion because it was created eight years after Hughes' last documented, in-person treatment session with Dr. Greene. R. 20-21. Hughes testified that he spoke with Dr. Greene via phone sometime between 2007 and 2010, R. 47-48, but these conversations are undocumented by Dr. Greene in the administrative record. As the ALJ reasoned, this significant gap in time reasonably weakens the supportability of the 2012 opinion regarding Hughes' mental limitations. R. 21. Hughes argues that Dr. Greene's

16

diagnosis of PTSD is "clear, convincing, unequivocal, consistent and repetitively confirmed in the medical evidence" over three decades, D. 12 at 10. However, "substantial evidence" of severe mental limitations existing specifically between 2000 and 2004 was required to demonstrate that Hughes was mentally disabled during those years. Garcia, 1994 WL 235328, at *2-3 (stating claimant's burden to prove disability existed prior to last date insured). Here, besides the 2012 mental RFC, there is no medical evidence from Dr. Greene after 2000 to support that Hughes was "totally, vocationally and socially disabled" on June 30, 2004. R. 1267. "Although the Commissioner may not assess residual functional capacity based on a bare medical record, [s]he is not precluded from rendering common-sense judgments based on medical findings, and [s]he may draw inferences from the record." Lacroix v. Barnhart, 352 F. Supp. 2d 100, 112 (D. Mass. 2005) (citations and internal quotation marks omitted). That is what the ALJ did here in considering the totality of the record, including Dr. Greene's 2012 mental RFC.

Namely, the ALJ cited several "other factors" that permissibly maybe deemed inconsistent with Dr. Greene's 2012 opinion, such as the medical evidence from physical examinations between 2000 and 2004 and Hughes' testimony about his mental functionality. The ALJ stated that the existence of numerous discrepancies between Dr. Greene's opinion and the overall record was the main basis for giving the treating source opinions' lesser weight. R. 20-21. Hughes argues it was an error to use physical treatment evidence to support a mental RFC, yet this evidence was all that was before the ALJ, given the twelve year gap in Dr. Greene's notes. Based on the evidence of Hughes' physical activity level, fitness routine and construction work, it was reasonable for the ALJ to conclude Hughes demonstrated "no restrictions in activities of daily living, moderate difficulty with social functioning, no difficulties

17

in maintaining concentration, persistence, or pace." R. 20. Regardless of his difficulty working with his son, Hughes' testimony illustrated that his physical impairments did not prevent him from completing the carpentry work. R. 54. The ALJ pointed to his long-standing marriage and relationships with his many siblings, as well as the absence of evidence of any other social problems, as facts inconsistent with Dr. Greene's assessment that Hughes cannot function socially. R. 20-21. Additionally, Hughes "did not testify to any further limitations due to his mental impairment," other than anxiety stemming from his lack of income and employment between 2000 and 2004. R. 19. This anxiety resulted from his concern over his health; Hughes did not reference the flashbacks or mental anguish stemming from his PTSD during his testimony. Nor is there evidence in the record of mental hospitalization or episodes of psychological decompensation to support that Hughes struggled with mental limitations. R. 20.

This Court finds that the ALJ appropriately reviewed all medical evidence in the record and acted within her discretion, under 20 C.F.R. § 404.1527(c)(2), to interpret the record as a whole, assign weight to Dr. Greene's opinions and determine an evidence-based RFC for Hughes' physical and mental abilities during the period in question.

## V. Conclusion

Based on the foregoing, the Commissioner's motion to affirm her decision, D. 17, is GRANTED and Hughes's Motion for Judgment on the Pleadings, D. 11, is DENIED.

**So Ordered.**

                                                   /s/ Denise J. Casper
                                                   United States District Judge